IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GEOCOMPLY SOLUTIONS INC.,     )
        )
       Plaintiff,     )
        )
    v.      )   C.A. No. 22-1273 (WCB)
        )
XPOINT SERVICES LLC,     )
        )
       Defendant.     )

**OPENING BRIEF IN SUPPORT OF XPOINT SERVICES LLC'S
MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**

OF COUNSEL:

Gary M. Rubman
Peter A. Swanson
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
(202) 662-6000

Michael E. Bowlus
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000

November 21, 2022

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Defendant Xpoint Services, LLC*

# TABLE OF CONTENTS

I.    Nature and Stage of the Proceeding ....................................................................... 1

II.   Summary of Argument ......................................................................................... 1

III.  Statement of Facts .............................................................................................. 2

IV.   Argument ........................................................................................................... 5

    A.    The '805 Patent Is Ineligible Under Section 101 .................................... 6

        1.    *Alice* Step One:  Claim 1 Is Directed to an Abstract Idea ........................ 7

        2.    *Alice* Step Two:  Claim 1 Does Not Recite an Inventive Concept ........... 13

        3.    The Remaining Claims Are Similarly Ineligible. .................................... 15

    B.    GeoComply Fails To Plausibly Allege Infringement ........................................... 16

        1.    GeoComply Has Not Plausibly Alleged That Xpoint Is
             Responsible for the Performance of All Claim Steps. ............................. 17

        2.    GeoComply Has Not Plausibly Alleged Contributory Infringement
             of Any Claim ........................................................................................ 19

V.    Conclusion ........................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018)......................................................................15

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
  797 F.3d 1020 (Fed. Cir. 2015) (en banc).............................................16, 17

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  573 U.S. 208 (2014).........................................................................7, 13, 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................6

*Beteiro, LLC v. BetMGM, LLC*,
  No. 1:21-cv-20156, 2022 WL 4092946 (D.N.J. Sept. 7, 2022).......................1, 9, 13

*Bozeman Fin. LLC v. Fed. Reserve Bank of Atlanta*,
  955 F.3d 971 (Fed. Cir. 2020)..........................................................12, 14, 15

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
  859 F.3d 1352 (Fed. Cir. 2017)....................................................................6

*Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*,
  958 F.3d 1178 (Fed. Cir. 2020).........................................................7, 11, 12, 14

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016)...................................................................11

*Epic IP LLC v. Backblaze, Inc.*,
  351 F. Supp. 3d 733 (D. Del. 2018)..............................................................10

*F'real Foods, LLC v. Hamilton Beach Brands, Inc.*,
  457 F. Supp. 3d 434 (D. Del. 2020)..............................................................19

*Free Stream Media Corp. v. Alphonso*,
  996 F.3d 1355 (Fed. Cir. 2021)...................................................................10

*Front Row Techs., LLC v. NBA Media Ventures, LLC*,
  204 F. Supp. 3d 1190 (D.N.M. 2016).............................................................13

*Intell. Ventures I LLC v. Cap. One Bank (USA)*,
  792 F.3d 1363 (Fed. Cir. 2015)............................................................................7, 9, 12

*Interval Licensing LLC v. AOL, Inc.*,
  896 F.3d 1335 (Fed. Cir. 2018)..................................................................................6, 10

*Lyda v. CBS Corp.*,
  838 F.3d 1331 (Fed. Cir. 2016)................................................................................16, 20

*Open Parking, LLC v. ParkMe, Inc.*,
  No. 2:15-cv-976, 2016 WL 3547957 (W.D. Pa. June 30, 2016) .............................6

*Philips Elec. N. Am. Corp. v. Contec Corp.*,
  411 F. Supp. 2d 470 (D. Del. 2006)..........................................................................19

*Planet Bingo LLC v. VKGS LLC*,
  576 F. App'x 1005 (Fed. Cir. 2014) .........................................................................12

*RecogniCorp, LLC v. Nintendo Co.*,
  855 F.3d 1322 (Fed. Cir. 2017)..................................................................................9

*SAP Am., Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018)..................................................................................11

*Simio, LLC v. FlexSim Software Prod., Inc.*,
  983 F.3d 1353 (Fed. Cir. 2020)..................................................................................15

*SmileDirectClub, LLC v. Candid Care Co.*,
  505 F. Supp. 3d 340 (D. Del. 2020)......................................................................15, 16

*Travel Sentry, Inc. v. Tropp*,
  877 F.3d 1370 (Fed. Cir. 2017)..............................................................................17, 18

*Universal Secure Registry LLC v. Apple Inc.*,
  10 F.4th 1342 (Fed. Cir. 2021) ........................................................................ *passim*

*Voter Verified, Inc. v. Election Sys. & Software Inc.*,
  887 F.3d 1376 (Fed. Cir. 2018)..................................................................................15

**Statutes**

35 U.S.C. § 101............................................................................................1, 2, 6, 15

**Other Authorities**

Fed. R. Civ. P. 8(a) ......................................................................................................5

Fed. R. Civ. P. 12(b) .................................................................................................6, 15

Nᴇᴠ. Gᴀᴍɪɴɢ Rᴇɢ. § 22.010 ..........................................................................................2, 9

Nᴇᴠ. Gᴀᴍɪɴɢ Rᴇɢ. § 22.060 ..........................................................................................2, 9

Roger Dunstan, *Gambling in California*, California Research Bureau ...........................................9

*Wendover Will*, Gʀᴇᴀᴛ Bᴀsɪɴ Cᴏʟʟ. ............................................................................1

## I.      NATURE AND STAGE OF THE PROCEEDING

GeoComply filed its complaint on September 27, 2022. *See* D.I. 1. The complaint alleges direct and contributory infringement of U.S. Patent No. 9,413,805 (the "'805 patent"). Xpoint now moves to dismiss the complaint for failure to state a claim upon which relief can be granted.

## II.     SUMMARY OF ARGUMENT

Xpoint is a new entrant into the market for geolocation services used to ensure that individuals engaging in online gaming, sports betting, and fantasy sports in the United States are located in a jurisdiction where such activities are allowed. GeoComply is by far the largest player in this market. Faced with the prospect of additional competition following Xpoint's recent launch, GeoComply filed this action asserting the '805 patent against Xpoint. The complaint fails to state a claim for two independent reasons.

*First*, the '805 patent is invalid under 35 U.S.C. § 101 because it claims an abstract idea: the basic concept of verifying a person's location to determine whether the person is allowed to engage in a transaction. This is a fundamental and longstanding practice in numerous areas, including the gaming industry. For example, applying for a driver's license typically requires providing written documentation that the applicant lives in the jurisdiction issuing the license. Moreover, in states where gambling activities are limited to riverboats or certain towns, casino operators take steps to ensure bettors are in a location where betting is permitted. As one example, the operators of the Stateline Hotel & Casino, which straddles the state line between Nevada (where gambling is legal) and Utah (where gambling is illegal), for decades ensured that patrons who wished to gamble were located on the Nevada side of the building, as demarcated by a white line on the floor. *See Beteiro, LLC v. BetMGM, LLC*, No. 1:21-cv-20156, 2022 WL 4092946, at *7 (D.N.J. Sept. 7, 2022) (citing Howard Hickson, *Wendover Will*, GREAT BASIN COLL., https://www.gbcnv.edu/howh/WendoverWill.html (last visited Nov. 18, 2022)). Likewise, sports

book operators must ensure individuals are placing bets for themselves, as opposed to acting on behalf of a better who may be at a different location. *See, e.g.,* NEV. GAMING REG. § 22.010(11) (defining "messenger bettor") (West 2005); *id.* § 22.060(5) (prohibiting acceptance of bets from messenger bettors).

The '805 patent does not claim any technological improvement for verifying a person's location using computer technology. The entirely functional claims employ generic components to collect "geolocation data," identify a list of "programs" present on a device (*e.g.*, programs that could be used to mask a user's location), and generate "a geolocation message" based on the data and programs. Nothing in the claims speaks to how the data is collected or the programs identified, or how the message is generated. Courts have repeatedly held that similar results-oriented claims directed to the concept of verifying transactions—as well as claims directed to location determination—are ineligible under section 101. The same conclusion applies here.

*Second*, the complaint fails to plausibly allege infringement, whether under a theory of direct infringement (Count I) or contributory infringement (Count II). GeoComply does not allege that a single actor performs all steps of the claims, and instead relies on conclusory and inconsistent allegations of joint infringement in support of each count. But the complaint lacks any plausible allegation that (a) Xpoint directs or controls an end user seeking to place a wager through a third-party online casino—a necessary showing for GeoComply's direct infringement claim, or (b) the online casino directs or controls the activities of Xpoint in providing geolocation services to the casino—a necessary showing for GeoComply's contributory infringement claim. Unable to plausibly allege joint infringement, GeoComply's complaint should be dismissed.

## III.   STATEMENT OF FACTS

The '805 patent, which claims priority to an application filed in 2011, is titled "Geolocation Engine." The specification describes the "present invention" as "determining a geo-location for a

device in communication with a network service provider." '805 patent (D.I. 1-1) at 1:23–25. The

patent explains that by analyzing both geolocation data and data regarding programs installed on

a user's device, a geolocation server may determine where the individual is located and whether

they are trying to be deceptive about their location (*e.g.*, "through such methods as 'screen sharing'

or use of 'proxy servers'"). *Id.* at 2:7–10.

The '805 patent includes ten claims. Two claims are independent (claims 1 and 10), and

the remaining eight claims all depend from claim 1. The complaint focuses on claim 1, which is

reproduced below:

| Claim 1 | Short Name for Claim Step |
|---|---|
| A method for determining a geo-location, the method comprising: | Preamble |
| transmitting a request to a first server by a first device; | "Requesting" |
| collecting geolocation data associated with the first device in response to the request, the geolocation data collected by a module stored in memory and executed by a processor on the first device, the first device in communication with the first server which provides a service over a network; | "Collecting" |
| identifying that one or more selected programs are present at the first device; | "Identifying" |
| transmitting the geolocation data and programs and a list of the present selected programs to a second server; | "Transmitting" |
| receiving a geolocation message from the second server, the geolocation message generated at least in part from the geolocation data and a list of the present selected programs; and | "Receiving" |
| providing the received geolocation message to the first server. | "Providing" |

The claims of the '805 patent are not limited to the use of geolocation technology in

gaming. The specification, however, focuses on gaming when describing these steps. *See, e.g.*,

'805 patent at 1:5–13. Each step is described in more detail below.

**Requesting Step:** A user accesses a gaming website (*e.g.*, DraftKings) on the user's phone

or computer by transmitting a request to a gaming server. *See* '805 patent at 4:12–17 & Fig. 4 (step

410). The gaming server, referred to in the claims as the "first server," is operated by the gaming

3

company (*e.g.*, DraftKings). *See* D.I. 1 ¶ 13 (referring to "gaming server" that a player accesses through a device).

**Collecting and Identifying Steps:** Data about the user's location is collected on the user's device. *See* '805 patent at 4:18–19 & Fig. 4 (step 420). Examples of the data that may be collected include "computer MAC address, WiFi access point data, the IP address of the computing device, screen sharing software data, proxy software, and other data." *Id.* at 4:54–57. Certain data, such as the WiFi and IP address data, may be used to determine the user's location. *See id.* at 3:31–41.

The presence of screen sharing or proxy programs on the user's device may indicate that the user is trying to appear to be in a location where they are not. *See id.* at 2:7–10. The Identifying Step involves determining whether one or more of these types of programs are present. *See id.* at 3:42–53. Notably, the specification does not describe how to identify such programs. It simply discloses a black-box "screen sharing protection module" and "proxy detection module." *Id.*

**Transmitting Step:** The location information is then transmitted to a "location processing server." *Id.* at 5:15–16 & Fig. 4 (step 430). This server, referred to as the "second server" in the claims, is operated by the geolocation provider. *See* D.I. 1 ¶ 13 (referring to geolocation data being sent to a "geolocation server"). According to the claims, three categories of information—(1) geolocation data, (2) programs, and (3) a list of programs that are present on the device—are transmitted from the user's device to the geolocation server in this step. *See id.* at 10:26–27.

**Receiving and Providing Steps:** According to claim 1, a "geolocation message" is generated at least in part "from the geolocation data and a list of the present selected programs." The '805 patent specification never discusses a "geolocation message," although dependent claim 9 recites a "geolocation message" indicating "a pass or fail of the first device regarding a

4

geolocation requirement." *Id.* at 10:54–56. The final two steps of claim 1 state that the "geolocation message" is received from the geolocation server and provided to the gaming server.

Both counts of infringement discuss three persons: Xpoint, a separate third-party company (PlayStar NJ LLC) that allegedly operates the "PlayStar online casino," D.I. 1 ¶ 15, and PlayStar's customers. GeoComply alleges that Xpoint is PlayStar's geolocation provider. *Id.* ¶ 18. In Count I (direct infringement), GeoComply alleges that Xpoint is responsible for the actions of PlayStar's customers who access and use the online casino. *Id.* ¶ 21. In Count II (contributory infringement), GeoComply alleges that PlayStar is responsible for the actions of both its customers *and* Xpoint, *id.* ¶ 44—and that Xpoint is liable for contributing to PlayStar's alleged infringement, *id.* ¶ 41.

Two days after filing its complaint, GeoComply filed a motion for expedited discovery. *See* D.I. 8. GeoComply explained that it intends to file a preliminary injunction motion, but that it first needs expedited discovery of Xpoint's source code to be able to provide a "detailed understanding of GeoComply's infringement allegations." *Id.* at 2; *see also id.* at 4 ("To detail its assertion [of infringement], GeoComply needs to analyze XPoint's source code, including the portions relating to the collections and transmission of data involving a first and second server."). The Court denied GeoComply's motion the next day. *See* D.I. 10.

Undeterred, GeoComply then sought to condition an extension of Xpoint's response deadline on Xpoint providing the very same expedited discovery that the Court had rejected. Xpoint was forced to seek relief from the Court, *see* D.I. 12, which the Court granted, *see* D.I. 14 (granting 30-day extension to respond to complaint).

## IV.   ARGUMENT

To state a claim upon which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must include more than mere "labels and conclusions" or "a formulaic recitation of

the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must set forth enough facts, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Patent eligibility under 35 U.S.C. § 101 is a question of law that may contain underlying issues of fact." *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1342 (Fed. Cir. 2018). "[P]atent eligibility can be determined at the Rule 12(b)(6) stage when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1346 (Fed. Cir. 2021) (citing *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018)) (quotation marks omitted); *see also Open Parking, LLC v. ParkMe, Inc.*, No. 2:15-cv-976, 2016 WL 3547957, at *2 (W.D. Pa. June 30, 2016), *aff'd*, 683 F. App'x 932 (Fed. Cir. 2017) ("If the patent that was allegedly infringed is invalid because it is directed to patent-ineligible subject matter, the complaint does not state a claim upon which relief can be granted."). The Federal Circuit has "repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced." *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017).

### A.    The '805 Patent Is Ineligible Under Section 101

Section 101 defines patentable subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. "Long-standing judicial exceptions, however, provide that laws of nature, natural phenomena, and abstract ideas are not eligible for patenting." *Universal Secure Registry*, 10 F.4th at 1346.

The Supreme Court has articulated a two-step test for examining patent eligibility. *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217–18 (2014). The first step asks whether the claims at issue are directed to a patent-ineligible concept, such as an abstract idea. *See id.* at 218. If so, then the second step "examine[s] the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 221 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72, 78–79 (2012)). If a claim is "specified at a high level of generality, is specified in functional terms, and merely invokes well-understood, routine, conventional components and activity to apply the abstract idea," the claim "fails at step two." *Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1183 (Fed. Cir. 2020).

### 1.    *Alice* Step One:  Claim 1 Is Directed to an Abstract Idea

Claim 1 of the '805 patent is directed to the abstract idea of verifying a person's location to determine whether the person is allowed to engage in a transaction. The claim recites a "method for determining a geo-location" using a handful of basic steps described in functional terms: (1) a device transmits a request to a first server; (2) the device collects unspecified "geolocation data" and identifies the presence of "programs" on the device; (3) the device transmits the geolocation data, the programs, and a list of programs to a second server; and (4) the second server generates a geolocation "message," based on the geolocation data and program list. Considering the claim's "character as a whole," *Universal Secure Registry*, 10 F.4th at 1346 (quotations and citations omitted), it is directed to the commonplace practice of requesting to engage in a transaction, providing data about the person's location, and using the data to determine whether to authorize the transaction.

This concept is a "longstanding commercial practice[]," *Elec. Commc'n Techs.*, 958 F.3d at 1183, and a "method[] of organizing human activity," *Intell. Ventures I LLC v. Cap. One Bank*

*(USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015). For example, obtaining a driver's license or a passport typically requires showing sufficient proof of residence.[1] Similarly, enrolling in a public college as an in-state student requires demonstrating that the student lives within the state.[2] These longstanding practices are directly analogous to the claimed method: a person provides both her address and some additional evidence to prove she is not misrepresenting her address (*e.g.*, a utility bill)—which is akin to the '805 patent's method of providing both geolocation data and a list of programs that could be used to misrepresent one's location—and this information is used to determine whether the person's request is valid.

Although claim 1 is not limited to gaming, verification of a person's location is also a familiar practice in the gaming industry. For example, in 1989, Iowa and Illinois legalized gaming on riverboats, and South Dakota legalized limited-stakes casino gambling so long as it took place

---

[1] For example, to obtain a driver's license in Delaware, applicants must provide two forms of proof of Delaware residency, from two different sources, each containing a residential street address that includes the applicant's name and is postmarked or dated within 60 days. *See* DMV, *Checklist to Obtain a Federally Complaint*, State of Delaware (effective Dec. 1, 2017), https://www.dmv.de.gov/DriverServices/drivers_license/secureID/pdfs/Driver_License_ID_Checklist.pdf?cache=1668434050382. Utility bills and cable bills are allowed, but personal mail is not, *see id.*, presumably because personal mail more easily allows someone to pretend to live somewhere they do not.

[2] To prove in-state residency at the University of Delaware, applicants must submit (1) a filed Delaware resident income tax return, (2) a federal tax return, and (3) at least two of the following items: proof of ownership of a permanent home in Delaware, a valid Delaware driver's license and Delaware vehicle registration, proof that the applicant uses her Delaware address as her sole address of record (*e.g.*, health insurance records, bank accounts, school records, etc.), or other probative evidence of Delaware residency (*e.g.*, letter form employer on employer's letterhead, transcript from a Delaware high school, Delaware professional license, etc.). *See Student Residency Classification for Tuition and Fee Purposes*, University of Delaware, https://sites.udel.edu/generalcounsel/policies/regulations-governing-the-classification-of-students-for-tuition-and-fee-purposes/, at V.B & V.C. (last visited Nov. 18, 2022). Even after the applicant provides this information, the Registrar's Office may utilize other resources, including various websites and search engines, to verify the applicant's residency status. *See id.* at V.A.

in the town of Deadwood.[3] And in 1990, Colorado approved limited-stakes casino gambling in three towns. *See id.* Gaming operators in these areas thus had to confirm that the bettor is in a location where betting is permitted, *e.g.*, on a riverboat (rather than on nearby land) or in a designated town. As one court recently held, "verifying a prospective bettor's location-based eligibility is a long-established business practice of those who accept bets, and thus is a 'fundamental economic practice,' a 'method of organizing human activity,' and consequently, an unpatentable abstract idea." *Beteiro*, 2022 WL 4092946, at *7; *see also id.* (describing the white line on the floor at the Stateline Hotel & Casino to identify the border between Nevada and Utah).

Gaming operators have also confronted attempts to evade such location restrictions. For instance, since at least 2005, Nevada has prohibited sports books from accepting bets from a person whom a sports book "knows or reasonably should know is a messenger bettor"—*i.e.*, someone seeking to place a bet as a proxy for the true bettor. NEV. GAMING REG. § 22.010(11) (defining "messenger bettor") (West 2005); *id.* § 22.060(5) (prohibiting acceptance of bets from messenger bettors); *id.* § 22.060(2) (bets at a sports book can only be placed on the sports book's "licensed premises"). Nevada's rule against proxy betting ensures that a bettor outside of a sports book cannot evade location restrictions by placing a bet through another person who is at the sports book—just as the '805 patent seeks to detect the use of a "proxy program" to evade location restrictions. '805 patent at 3:48–49 & claim 7.

The '805 patent does not claim "a specific means or method for improving [location verification] technology." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (cleaned up); *see also Universal Secure Registry*, 10 F.4th at 1346 ("In cases involving

---

[3] *See* Roger Dunstan, *Gambling in California*, California Research Bureau, CRB 97-003, at I-7 (Jan. 1997), https://www.library.ca.gov/wp-content/uploads/crb-reports/97-003.pdf.

authentication technology, patent eligibility often turns on whether the claims provide sufficient specificity to constitute an improvement to computer functionality itself."); *Epic IP LLC v. Backblaze, Inc.*, 351 F. Supp. 3d 733, 737 (D. Del. 2018) ("Numerous Federal Circuit decisions have drawn the distinction between patent-eligible claims that are directed to a specific improvement in the capabilities of computing devices, as opposed to a process that qualifies as an abstract idea for which computers are invoked merely as a tool.") (cleaned up).

The claim recites three generic computer components: a "first device," a "first server," and a "second server." No improved functionality is described for the device: it simply collects, transmits, and receives information in ordinary fashion. Similarly, no improved functionality is described for the servers, as they receive, analyze, and transmit information in ordinary fashion. As the Federal Circuit has explained with respect to similar claims, claim 1 here "simply recite[s] conventional actions in a generic way." *Universal Secure Registry*, 10 F.4th at 1349 (quotations omitted) (characterizing the claimed actions as "receiving a transaction request, verifying the identity of the customer and merchant, [and] allowing a transaction").

Nor does the claim "'have the specificity required to transform the claim from one claiming only a result to one claiming a way of achieving it.'" *Free Stream Media Corp. v. Alphonso*, 996 F.3d 1355, 1363 (Fed. Cir. 2021) (quoting *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167–68 (Fed. Cir. 2018)) (cleaned up). Claim 1 requires "collecting geolocation data" and "identifying that one or more selected programs are present at the first device," but it does not specify *how* these functions are accomplished. Nor does the claim explain how "the geolocation message [is] generated" based on the geolocation data and list of programs. The results-oriented nature of the claim further demonstrates the claim is abstract. *See Free Stream Media*, 996 F.3d at 1363–64 (holding claims invalid where they "do not at all describe how that result is achieved"); *Interval*

10

*Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1345 (Fed. Cir. 2018) ("the claimed instructions do not impose meaningful limitations on the purported solution of an attention manager that would improve a computer as a tool").

Lacking any specificity as to how the result is achieved, the claim amounts to nothing more than collecting, transmitting, and processing data. The Federal Circuit has repeatedly held that such claims are unpatentable. *See, e.g.*, *Elec. Commc'n Techs.*, 958 F.3d at 1182 (claim was abstract "because it amounts to nothing more than gathering, storing, and transmitting information"); *SAP Am.*, 898 F.3d at 1167 (claims were abstract where they focused on "selecting certain information, analyzing it using mathematical techniques, and reporting or displaying the results of the analysis"); *Elec. Power Grp.*, *LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) ("merely presenting the results of abstract processes of collecting and analyzing information, without more" is abstract).

The specification confirms that claim 1 is not directed to "[any] specific solution to a technological problem." *Universal Secure Registry*, 10 F.4th at 1355. It establishes that the use of WiFi and IP address data to determine a user's location was conventional, as it teaches the use of "third parties" to provide this functionality. '805 patent at 5:60–62; *see also id.* at 6:3–6 ("Information for determining location may be retrieved from several sources. For example, WiFi data may be received from Skyhook Wireless and IP Database information may be retrieved from MaxMind, Inc."). It also describes the detection of location-masking programs—which is performed by "screen sharing protection module 330" and "proxy detection module 340"—in entirely generic terms: these modules "determine if the device includes a screen sharing program" or "a proxy program," and if so, they "may block the program or otherwise communicate its

presence as part of the overall decision on allowing the device to access a service." *Id.* at 3:42–52. The patent does not elucidate on this black box description.

The Federal Circuit has repeatedly concluded that analogous software claims directed to transaction verification are unpatentably abstract. For example, in *Universal Secure Registry*, the Federal Circuit held ineligible several user authentication patents, including one that "merely combines conventional authentication techniques . . . to achieve an expected cumulative higher degree of authentication integrity." 10 F.4th at 1357; *see also Bozeman Fin. LLC v. Fed. Reserve Bank of Atlanta*, 955 F.3d 971, 978 (Fed. Cir. 2020) (patent directed to "[v]erifying financial documents to reduce transactional fraud"); *Planet Bingo LLC v. VKGS LLC*, 576 F. App'x 1005, 1008 (Fed. Cir. 2014) (patents "directed to the abstract idea of solving a tampering problem and also minimizing other security risks during bingo ticket purchases" (cleaned up)).

The Federal Circuit has also found ineligible claims relating to location determination. In *Intellectual Ventures I*, for example, the claim at issue encompassed "tailoring content based on the viewer's location or address," which was an abstract idea because "newspaper inserts had often been tailored based on information known about the customer." 792 F.3d at 1369. And in *Electronic Communication Technologies*, the claim included a step of initiating a notification to a party in advance of the arrival of a "mobile thing"—such as a package—based in part "on the location of the mobile thing." 958 F.3d at 1181 (quotation and citation omitted). The court concluded that the claim was directed to an abstract idea because "business practices designed to advise customers of the status of delivery of their goods have existed at least for several decades, if not longer," *id.* (quotation and citation omitted), and the claim "amount[ed] to nothing more than gathering, storing, and transmitting information," *id.* at 1182.

Recent district court decisions addressing similar geolocation claims, including in the context of gaming, have concluded that the claims are directed to abstract ideas. In *Beteiro*, the claim at issue covered "exchanging information concerning a bet and allowing or disallowing the bet based on where the user is located." 2022 WL 4092946, at *6 (quotation and citation omitted). The court concluded that "the concept of taking action in response to location-based information . . . is abstract and patent-ineligible." *Id.* at *7 (quotation and citation omitted). Similarly, in *CG Technology Development, LLC v. FanDuel, Inc.*, the court observed that the claim recited "basic steps of determining the configuration of a game based on the location of a mobile device, a method of organizing human activity," such that the claim was directed to a patent-ineligible abstract idea. 442 F. Supp. 3d 840, 847 (D. Del. 2020), *aff'd,* 858 F. App'x 363 (Fed. Cir. 2021); *see also Front Row Techs., LLC v. NBA Media Ventures, LLC*, 204 F. Supp. 3d 1190, 1267 (D.N.M. 2016), *aff'd sub nom. Front Row Techs., LLC v. MLB Advanced Media, L.P.*, 697 F. App'x 701 (Fed. Cir. 2017) (claim was directed to the abstract idea of "authorizing handheld devices to receive streaming video based on a user's location").

Similar to these Federal Circuit and district court cases, claim 1 of the '805 patent is directed to the abstract idea of verifying a person's location to determine whether the person may engage in a transaction, without claiming any specific technological improvement. Claim 1 thus fails the first step of the *Alice* test.

### 2. *Alice* Step Two:  Claim 1 Does Not Recite an Inventive Concept

Claim 1 also fails step two of the *Alice* test because whether the claim elements are considered individually or as an ordered combination, they do not "transform" the claimed abstract idea into patent-eligible subject matter. *Alice*, 573 U.S. at 221. The claim lacks any "inventive concept" because it "is specified at a high level of generality, is specified in functional terms, and merely invokes well-understood, routine, conventional components and activity to apply the

abstract idea." *Elec. Commc'n Techs.*, 958 F.3d at 1183. Claim 1 recites a generic "device" with a generic "memory" and "processor," as well as two generic "server[s]." These components carry out only conventional computer functions: the device carries out steps of "transmitting" a request and various data, "collecting" data using its processor, and "identifying" programs that are present on the device, while the claimed servers transmit and receive data, and generate a "message" based on the data. Moreover, the combination of these conventional steps amounts to no more than the abstract idea of verifying location based on information from the user's device.

The specification further confirms that the '805 patent lacks any inventive concept. The specification admits that the components are entirely conventional, going so far as to state that the components "contained in the computer system 600 of FIG. 6 are those typically found in computer systems that may be suitable for use with embodiments of the present invention and are intended to represent a broad category of such computer components that are well known in the art." '805 patent at 8:44–48; *see also id.* at 9:55–69 (nearly identical statement as to "computer system 700"). And, as discussed above, the specification demonstrates that geolocation functionality and program-detection functionality were conventional. *Supra* at p. 11. The patent thus fails to describe any additional features that would transform the abstract idea of claim 1 into a patent-eligible invention. *See Bozeman*, 955 F.3d at 980 (*Alice* step two not met where the specification "explains that methods for inhibiting check fraud and verifying financial transactions were well-known" and that "the technological components recited in [the] claim . . . were conventional, off-the-shelf computer components").

The complaint, like the patent specification, fails to identify any inventive concept because it does not plausibly allege that any aspect of claim 1 is unconventional, non-routine, or not well-understood. *See* D.I. 1 ¶¶ 11–13. Instead, the complaint alleges that the patent "provides an

innovative geolocation engine that is highly secure and versatile," and summarizes the routine and conventional steps described in the specification. *Id.* These conclusory allegations are insufficient to allege an inventive concept. *See Simio, LLC v. FlexSim Software Prod., Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020) ("We disregard conclusory statements when evaluating a complaint under Rule 12(b)(6). A statement that a feature 'improves the functioning and operations of the computer' is, by itself, conclusory.") (cleaned up); *cf. Aatrix Software*, 882 F.3d at 1128 (vacating dismissal of a complaint with "concrete" allegations that "individual elements and the claimed combination are not well-understood, routine, or conventional activity").

### 3.    The Remaining Claims Are Similarly Ineligible.

Claim 10—the only other independent claim of the '805 patent—is substantially similar to claim 1 and is directed to the same abstract idea. Claim 10 repeats the method steps recited in claim 1, but provides that they are carried out in a "program" embodied in a "computer readable storage medium." Where, as here, "the only difference between claims is the form in which they are drafted, it is appropriate to treat them as 'as equivalent for purposes of patent eligibility under § 101.'" *SmileDirectClub, LLC v. Candid Care Co.*, 505 F. Supp. 3d 340, 347 (D. Del. 2020), *aff'd,* 856 F. App'x 893 (Fed. Cir. 2021) (quoting *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1277 (Fed. Cir. 2012)). Thus, claim 10 is invalid for the same reasons as claim 1. *See Voter Verified, Inc. v. Election Sys. & Software Inc.*, 887 F.3d 1376, 1385 (Fed. Cir. 2018) ("While these claims encompass both methods and systems, we find there to be no distinction between them for § 101 purposes, as they simply recite the same concept.").

Dependent claims 2 through 9 do not confer subject matter eligibility because they "simply add steps or conditions to the workflow recited in claim 1." *SmileDirectClub*, 505 F. Supp. 3d at 347. Claim 2 limits the "device" to a "mobile" device and requires a "mobile application" on the device to collect the geolocation data. '805 patent at 10:34-36. Claim 3 requires a "network

browser plug-in" to collect the device's geolocation. *Id.* at 10:37-39.  Claim 4 requires collection of geolocation data for one or more "remote" devices in the proximity of the first device. *Id.* at 10:40-43.  Claim 5 requires collection of "device data from the network." *Id.* at 10:44-46.  Claim 6 requires the device to collect "building information." Claims 7 and 8 require that the "programs" identified on the device include either a "proxy application" or a "screen sharing program," respectively.  *Id.* at 10:50-54.  Claim 9 requires that the geolocation "message" is in "binary" form, indicating "pass or fail" of a "geolocation requirement" by the device. *Id.* at 10:54-56.

Each of these dependent claims is "directed to the same idea" as claim 1, and "none add any new technological improvements." *SmileDirectClub*, 505 F. Supp. 3d at 347. Thus, claims 2 through 9 are invalid for the same reasons as claim 1.

## B.     GeoComply Fails To Plausibly Allege Infringement

Both counts in the complaint depend on a theory of divided infringement wherein multiple actors perform distinct steps of the claimed method. *See* D.I. 1 ¶¶ 20, 43. Infringement of a method claim requires that "all steps of a claimed method are performed by or attributable to a single entity." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (en banc). A single entity is responsible for another actor's performance of method steps where either: (1) the entity directs or controls the other actor's performance; or (2) the actors form a joint enterprise. *See id.* Where, as here, a plaintiff alleges "direction or control," D.I. ¶¶ 25, 58, the plaintiff must "plead[] facts sufficient to allow a reasonable inference that all steps of the claimed method are performed and . . . one party exercises the requisite 'direction and control' over the other's performance." *Lyda v. CBS Corp.*, 838 F.3d 1331, 1339 (Fed. Cir. 2016).

GeoComply fails to plead such facts in support of either count. According to the complaint, two actors—PlayStar's end users (or software on their devices) and Xpoint—combine to perform the steps of the claimed method. In Count I (direct infringement), GeoComply alleges that Xpoint

directs or controls the actions of PlayStar's end users (*e.g.,* an individual who wants to play PlayStar on her phone or computer). *See* D.I. ¶ 21. But the complaint lacks any factual allegations showing that a user's communications with PlayStar are attributable to Xpoint. In Count II (contributory infringement), GeoComply takes a different approach by alleging that PlayStar is responsible for the performance of the claimed method. *See id.* ¶ 44. But GeoComply pleads no facts showing that PlayStar directs or controls Xpoint, whose actions allegedly satisfy at least one claim step. *See id.* ¶¶ 57–61. Because the complaint contains no plausible theory of direction or control, Counts I and II should be dismissed.

### 1.    GeoComply Has Not Plausibly Alleged That Xpoint Is Responsible for the Performance of All Claim Steps.

"Direction or control" may be found where an alleged infringer: (1) conditions participation in an activity or receipt of a benefit upon performance of the claimed step; and (2) establishes the manner or timing of that performance. *See Akamai*, 797 F.3d at 1023.[4] This does not require that the alleged infringer impose legal or contractual duties, but the parties must contemplate a benefit that is achieved only if the third party "performs certain steps identified by the defendant, and does so under the terms prescribed by the defendant." *Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1380 (Fed. Cir. 2017).

The complaint here fails to plausibly allege that Xpoint directs or controls PlayStar's users with regard to any of the steps of claim 1. For purposes of this motion, however, Xpoint focuses on the first step: "transmitting a request to a first server by a first device" (the Requesting step). The complaint alleges that a user of PlayStar's online casino performs this step "when accessing

---

[4] *Akamai* also holds that "general principles of vicarious liability" may be used to analyze direction or control. *Akamai*, 797 F.3d at 1022. The complaint, however, relies exclusively on a theory of conditioned performance.

the PlayStar online casino and attempting to place a wager." D.I. 1 ¶ 24. That is, the Requesting step allegedly takes place before any geolocation is performed. GeoComply admits that Xpoint's software does not perform the functionality of this step. *See id.* ¶ 64 (identifying in italics the steps allegedly performed by Xpoint's software).

Despite Xpoint's undisputed lack of involvement in the Requesting step, GeoComply makes a conclusory allegation that "Xpoint conditions an end-user's participation in an activity or receipt of a benefit upon the end-user's performance of the step of transmitting a request." *Id.* ¶ 25. But GeoComply alleges no facts showing that *Xpoint*—the sole defendant in this case—imposes any conditions on the users of a third-party online casino. The complaint states only that "[a]n end-user who wishes to place a wager at the PlayStar online casino must transmit a request." *Id.* ¶ 25. This allegation, even if true, does not establish that *Xpoint* is responsible for requiring the user to transmit a request to PlayStar before wagering at PlayStar's casino.

The complaint itself contradicts GeoComply's conclusory allegation that Xpoint conditions the user's activity on performance of the Requesting step. Just two sentences later, GeoComply admits that "online casinos and sportsbooks"—not Xpoint—are required to "geo-locate users attempting to place a wager." *Id.* The complaint also cites, in support of GeoComply's alternative theory that PlayStar directs and controls its users, multiple communications between PlayStar and its users explaining the terms and conditions of using PlayStar's online casino, including PlayStar's Privacy Policy, FAQ page, and End-User License Agreement. *See* D.I. 1 ¶¶ 48–53 (noting that end-users are "required to download a 'plugin'" to verify their location "prior to accessing real-money gaming" per PlayStar's End-User License Agreement). These allegations confirm that Xpoint does not set the conditions on which users access PlayStar's casino.

Nor does GeoComply plausibly allege that Xpoint establishes the "manner or timing" of users accessing PlayStar's casino. The complaint alleges that Xpoint "integrates its geolocation technology into the PlayStar online casino," thereby "provid[ing] end-users with the manner of" performing the Requesting step. D.I. 1 ¶ 26. But GeoComply admits that Xpoint's geolocation software is not used in this step. *See id.* ¶ 64; *see also id.* ¶ 26 (alleging that the Requesting step "causes the geo-location method to proceed by operation of XPoint software"). There is simply no plausible allegation that Xpoint has anything to do with—let alone dictates the manner or timing of—the user's transmission of a wagering request to PlayStar. *See F'real Foods, LLC v. Hamilton Beach Brands, Inc.*, 457 F. Supp. 3d 434, 444–45 (D. Del. 2020) (granting judgment as a matter of law on claim that manufacturer directed or controlled retailer's or customer's use of product).

### 2. GeoComply Has Not Plausibly Alleged Contributory Infringement of Any Claim.

In Count II, GeoComply asserts that Xpoint is liable for contributory infringement. D.I. 1 ¶ 41. A claim of contributory infringement requires, "as a predicate, that there has in fact been direct infringement of the patent in suit." *Philips Elec. N. Am. Corp. v. Contec Corp.*, 411 F. Supp. 2d 470, 474 (D. Del. 2006) (citing *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005)). In Count II, GeoComply presents an "alternative" theory of divided infringement, *see* D.I. 1 ¶ 41, under which PlayStar allegedly directs or controls the performance of claim steps by both PlayStar's users and Xpoint, *see id.* ¶ 44. Although the allegations in Count II are unclear and internally inconsistent,[5] the complaint makes clear that the

---

[5] For example, immediately after alleging that PlayStar "directly infringes the '805 Patent" by "control[ling] or direct[ing] the activities of its end-users and XPoint," D.I. 1 ¶ 44, the complaint alleges that "PlayStar's online gaming customers directly infringe claims of the '805 Patent" by "control[ling] or direct[ing] the activities of all parties who commit acts that constitute infringement," *id.* ¶ 45. The complaint provides no support for a theory that PlayStar's customers direct or control others' performance of the claim steps. Thus, GeoComply has failed to state a claim with respect to this theory.

final step of claim 1—providing the received geolocation message to the first server—is allegedly performed by Xpoint. *See id.* ¶ 60 ("XPoint determines whether an end-user has passed or failed an eligibility check, forms a geolocation message that includes whether the user passed or failed, and *provides that message to the server hosting the PlayStar online casino*." (emphasis added)).

GeoComply fails to allege any facts showing that PlayStar directs or controls Xpoint's alleged performance of the Providing step. The complaint contains only a bare allegation that Xpoint's actions "are done at the direction or control of PlayStar." D.I. 1 ¶ 58. The suggestion that Xpoint is directed or controlled by its customer is both facially implausible and, more importantly, not supported by a single factual allegation. Because a complaint must provide more than "mere conclusory statements" when alleging "direction or control," *Lyda*, 838 F.3d at 1337, 1339, Count II fails to state a claim for infringement of claim 1.

GeoComply similarly fails to state a claim for infringement of claim 10, which is mentioned in passing within Count II. *See* D.I. 1 ¶ 43. Claim 10 recites an apparatus that performs the method set forth in claim 1. The complaint, however, does not contain any allegation as to how the alleged direct infringer, PlayStar, made, used, sold, or imported such an apparatus, no doubt because GeoComply cannot plausibly allege as such. As explained above, GeoComply alleges infringement based on a multi-platform, multi-user arrangement—not a single apparatus as required by claim 10.

## V.  CONCLUSION

GeoComply's complaint fails to state a claim upon which relief can be granted and should be dismissed with prejudice.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

OF COUNSEL:

Gary M. Rubman
Peter A. Swanson
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
(202) 662-6000

Michael E. Bowlus
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA  94105-2533
(415) 591-6000

November 21, 2022

_____
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 21, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on November 21, 2022, upon the following in the manner indicated:

Jeffrey J. Lyons, Esquire                                                        *VIA ELECTRONIC MAIL*
BAKER & HOSTETLER LLP
1201 North Market Street, Suite 1402
Wilmington, DE  19801
*Attorneys for Plaintiff*

Douglas A. Grady, Esquire                                                  *VIA ELECTRONIC MAIL*
Paul J. Bruene, Esquire
BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA  98104
*Attorneys for Plaintiff*

Andrew E. Samuels, Esquire                                               *VIA ELECTRONIC MAIL*
BAKER & HOSTETLER LLP
200 Civic Center Drive, Suite 1200
Columbus, OH  43215
*Attorneys for Plaintiff*

Kevin P. Flynn, Esquire                                                       *VIA ELECTRONIC MAIL*
BAKER & HOSTETLER LLP
312 Walnut Street, Suite 3200
Cincinnati, OH  45202
*Attorneys for Plaintiff*

*/s/ Jeremy A. Tigan*
_____
Jeremy A. Tigan (#5239)